## KENNEDY v. GENERAL MOTORS CORPORATION.

### No. 542.

District Court, E. D. Michigan,
Northern Division.

Sept. 28, 1935.

Dyrenforth, Lee, Chritton & Wiles, Russell Wiles, and Horace Dawson, all of Chicago, Ill., for plaintiff.

Drury W. Cooper and Drury W. Cooper, Jr., both of New York City, and E. D. Sewall and Bruce G. Booth, both of Detroit, Mich., for defendant.

TUTTLE, District Judge.

This suit has to do with Frederic T. Kennedy patent No. 1,514,664; patent application which was made November 19, 1923, and the patent granted November 11, 1924, to plaintiff. It is a patent for a process of preparing iron for malleable castings.

The suit is directed against the iron melting practice carried on by defendant through its Saginaw Malleable Iron Division at Saginaw, Mich.

The purpose of the Kennedy process, as I understand it, is to save time by utilizing the full capacity of the furnace ordinarily used for making malleable iron. The method for using the full capacity of the furnace, and thereby saving time, is to put into that furnace some iron, then supply from the cupola hot iron, and then to heat the full furnace. In that way it takes less heat and less time because the iron that comes from the cupola is hot; and by putting the desired combination of cold scrap iron and molten cupola iron into the furnace, they get the desired product more rapidly and operate the furnace nearer to capacity than they would if they did all the melting in the furnace.

It seems that in the prior art it was usual and common to heat or melt malleable iron in the furnace and to heat

or melt cast iron in the cupola. The cupola is a faster and a cheaper means of melting than the furnace. The method suggested is a simple and natural thing to do. It is claimed that because we waited so long without its being done, that ought to be a very big item in the court's thought in weighing the step.

The court should always weigh the difficulties and what the value of the thing is to determine whether or not it presents that amount of genius which should be rewarded by a patent; or whether it presents merely mechanical skill, which people working in the art ought to be permitted to exercise.

We ought not to subdivide the iron art into little parts in weighing the thing selected. Counsel for plaintiff agree to that rule, and recognize it.

Here we have these different kinds of iron, usually considered in one class by people in the iron trade. The same people that are dealing with cast iron are likely to be thinking about malleable iron, and vice versa. We find cast iron and malleable iron often being made in the same building, by the same owners, and the same employees, who are testing and working in the art. We have the same chemical substances. We have the cast iron, which has more carbon in it. We begin to find people testing for that carbon, taking it out, refining it. The method of making cast iron seems to add some things like carbon that are not very harmful for certain uses for the iron, and for other uses it is necessary to get rid of that carbon. For certain uses, they need to get rid of more of the carbon than they do in others.

Then we find in the very getting of the iron, refining it, i. e., the taking out of the sulphur and other things, it is necessary to have different ways of refining, different ways of melting, different ways of smelting. Of course, all the way through, the people in the industry are thinking about what kind of a product they want to get, the use they want to make of it; and then when it comes to producing that particular kind of a product, it is a problem of economy in time saving and fuel saving. They all necessarily run along together in the problem. The first thing to determine is the kind of a product they want, and then how to make that product as cheaply as possible.

The cupola had been used in iron foundries for many years as a melting medium, and foundries of all kinds, including malleable iron foundries, usually had cupolas as well as furnaces for melting and refining. It was and is the cheapest and quickest method of melting iron known to the industry, but it was difficult to obtain accurate results by its use alone.

It was old, as in the Durfee patent No. 118,597 issued in 1871, to use one or more cupolas with one or more gas or reverberatory furnaces for making malleable iron, so arranged that the metal melted in the cupolas could be tapped and run into the gas or reverberatory furnaces and from the latter into molds or into ladles to be poured into molds. After the molten cupola metal had been run into the gas or reverberatory furnace, samples of the metal were taken therefrom and tested and thereupon the molten metal could be treated in any way to give it the desired qualities for any kind of castings.

Beginning in June, 1919, and continuing until April, 1921, the American Cast Iron Pipe Company of Birmingham, Ala., made cast iron (Gray Iron) pipes by the use of the following duplexing process: An electric furnace was used in connection with cupolas. Until 1920, the electric furnace had an acid lining and thereafter a basic lining. About ten tons of molten cupola metal were poured into the electric furnace on top of about one ton of steel scrap which had been placed therein. The cupola metal was poured into the electric furnace in ladles of about three tons each. As soon as the first ladleful had been poured into the furnace, the electricity was turned on. Then the rest of the ten tons of cupola metal were ladled into the furnace and the combined metal heated until pouring temperature was reached. The metal was then poured into molds by means of the usual pouring ladles. Throughout the day a continuous process was carried on by tapping out of the electric furnace a ladleful of metal at a time to be poured. Then about 10 per cent. of cold steel scrap was dumped into the electric furnace and 90 per cent. molten cupola metal poured in. Both the cupola metal and that in the furnace were tested and analyzed periodically and the proper additions (say, steel, ferro-manganese, or ferro-silicate) were made to the metal in the electric

furnace. In this way gray iron of accurate analysis was obtained. The chief reason for placing steel scrap in the electric furnace was to drop the content of the carbon which had been picked up from the coke in the cupola by the metal which had been melted therein.

So far as speed is concerned, the American Cast Iron Pipe Company were using that speed. They were making the big bulk of their iron in the cheaply operated cupola, and they were adding the scrap steel which tended to reduce the carbon in the final product. They could, and did, regulate that by the amount of scrap steel they put in, and they were gaining the advantage of the heat of the cheaply produced metal in the cupola, to help melt or dissolve the scrap steel. Whether we call it melting, dissolving, or both, it was making that scrap steel into the molten mass which would be uniform and tend to reduce the carbon content of the mixed mass, and when they got through they did not have malleable iron, but they had this grade of cast iron from which they could make the thin tubes. There may have been some refining by their method, but they did not need any for their use and therefore it was a mere incident.

In 1914, the National Malleable & Steel Castings Company used at Chicago the same duplexing process that the American Cast Iron Pipe Company used at Birmingham, except that they made malleable iron instead of cast or gray iron as the latter company did.

The Ohio Malleable Iron Company at Columbus say that they made malleable iron, but the records are not so complete as they are as to what was done in Alabama and Chicago, by the American Cast Iron Pipe Company and the National Malleable & Castings Company.

It is a pretty narrow step to say that the patent in suit is distinct over the prior use of the Ohio Malleable Iron Company at Columbus simply because there is some doubt that the latter company made malleable iron. You have the full use of the heater in the prior art, you have the economy, you have the use of the furnace in connection with the cupola, you have the use in Chicago, by the National Malleable & Casting Company, in making malleable iron. That use is small in Chicago, but the use by the patentee-inventor is still smaller because

he has made no practical use of the patent. These things in the art, being used in this multiplicity of ways, seem to me to prevent any one from getting a patent for what is here claimed.

The use in Chicago alone, it would seem, would be enough to be an anticipation direct, and it seems to me the use in Alabama is so similar that if we did not have this Chicago step, you could hardly weigh it up and grant a patent for it.

In addition, we have the publications, and it seems to me that the publications tell the whole story. I cannot read the Elliott article (Defendant's Exhibit No. 12) entitled, "The Electric Furnace as an Adjunct to the Cupola," which was published in the Transactions of the American Foundrymen's Association, Vol. XXVIII, beginning at page 352, and find anything new in the Kennedy patent in suit. It seems to me as though Elliott tells the story. Elliott tells this story, and more. He tells about the different kinds of linings in the furnaces, the acid and the basic, and their different uses. Of course, they can do a good job of refining in a furnace if they have the basic lining. If they have the acid, they cannot do very much refining without getting into trouble. He explains that and that seems to have been well known and well understood, and it seems almost as dangerous to let a patent go into that art at that stage of it, and lay down some regulation as to the use back and forth between the cupola and the furnace, as it would to go into the kitchen and claim an invention as to the use by the cook of the different culinary utensils in her department. They are all there in the same art in close proximity to each other.

We do not find that, following the disclosure of Kennedy in 1923, any great changes were made in the art. What the defendant does seems to grow naturally out of the Alabama practice and the Chicago practice, and the publications of Elliott. Kennedy seems to approach the problem from the standpoint of the man standing by the furnace. He described it from that end. He talks about saving time with his furnace and using it to full capacity, and getting his hot iron from the cupola; while the others have discussed it more in its natural course from the mine to the finished

product. The great mass of the ingredients, even with Kennedy, comes from the cupola, and it seems to me as though that were the more natural way to describe it.

My conclusion is that the patent does not disclose the sort of thing in this art which entitled it to step into that field. I think the patent is void, I so hold, and dismiss the bill. This opinion may stand as the findings of fact and conclusions of law.